IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**CESAR ALARCON-RODRIGUEZ**<br>Defendant. | Criminal No. 23-354 (FAB) |

**REPORT AND RECOMMENDATION**

**I.    Introduction**

On September 20, 2023, Carlos Alarcón Rodríguez ("Defendant") was charged with six counts of delay or destruction of mail in violation of 18 U.S.C. § 1703 and one count of theft of mail matter by officer or employee in violation of 18 U.S.C. § 1709 for conduct that allegedly took place from on or about November 11, 2022, through or about December 13, 2022. Docket No. 1. The Government filed a motion *in limine* seeking that the Court preclude Defendant from presenting to the jury arguments that the United States Postal Service ("USPS") Office of Inspector General ("OIG") could not install a video surveillance camera to observe Defendant during working hours. Docket No. 22. Defendant opposed. Docket No. 27. Defendant filed a motion to suppress evidence seized through surveillance videos of Defendant during working hours and incriminating statements made by him to the agent of the USPS OIG. Docket No. 25. The Government opposed. Docket No. 32-1.

The motions *in limine* and to suppress were referred to the undersigned for a hearing and Report and Recommendation. Docket Nos. 28 and 30. An evidentiary hearing was held on April 22, 2024. See Docket No. 40. Defendant testified. The Government called USPS Supervisor Jaime L. Martínez and USPS OIG Special Agent Steven Martínez ("Agent Martínez"). Documentary evidence was admitted. After carefully considering the evidence and arguments, the undersigned

**United States v. Alarcón-Rodríguez**
**Criminal No. 23-354 (FAB)**
**Report and Recommendation**

recommends that Defendant's motion to suppress be **DENIED** and that the Government's motion *in limine* be **GRANTED**.

### II. Factual Background

The following account is drawn from the credible evidence received at the evidentiary hearing.

On November 2022, Defendant worked as a Mail Processing Clerk in the USPS at La Cerámica, Carolina, Puerto Rico. Transcript of Hearing on April 22, 2024, at Docket No. 46 ("Tr.") 20: 2-8; Government Exhibit I. La Cerámica is a large building or warehouse in the possession of the USPS. Tr. 20: 12-17; Tr. 157: 21-23. Approximately 300 people work at La Cerámica at a given time. Tr. 42: 7-8. Defendant worked with a machine called a Canceler, which is a machine that processes letters. Tr. 22: 6-22; Government Exhibit E. The letters are fed into the machine by other employees or Mail Handlers. Tr. 23: 24-25. Defendant receives the letters that come out of the machine. Tr. 24: 16-21. He places the letters on dollies as they come out of the machine and those dollies are picked up by other employees. Tr. 27: 7-24. Defendant did not have an office space. Tr. 20: 12-14. There are no walls or doors separating the two Cancelers in the warehouse or separating the Cancelers from the rest of the warehouse. Tr. 45: 6-24; Tr. 111: 5-12; Government Exhibits A and A-1. At any given time in a work shift, around 20 people work near where the Cancelers are located . Tr. 49: 5-16. People come in and out of the general area where Defendant works, including to access the punch clock and the coffee machine. Tr. 113: 6-24; Tr. 119: 18-25; Tr. 165: 16-18. There is another USPS employee that works in Defendant's workstation when he is not on duty. Tr. 51: 10-25. Other USPS employees, such as mail handlers and maintenance employees, sometimes work on the same machine as Defendant during his shift. Tr. 50: 16-24; Tr. 52: 16-21; Tr. 57: 16-20; Government Exhibits B, B-1, C, C-1, D, D-1.

Agent Martínez works for the USPS OIG. Tr. 147: 7-8. His duties are to investigate internal crimes of the USPS, including mail theft, delay of the mail, and the destruction of the mail. Tr. 147: 20-24. Agent Martínez commenced an investigation concerning a complaint of ripped-open greeting cards in Florida. Tr. 149: 17-22. Upon scanning the bar codes in the ripped-open envelopes, Agent Martínez learned that the envelopes were processed in the Canceler machine operated by Defendant during his shift. Tr. 155: 7-25; Tr. 156: 1-15. Agent Martínez decided to install surveillance cameras above both Canceler machines at La Cerámica to capture any illegal

activity with respect to the mail. Tr. 157: 19-20; Tr. 160: 6-15. The video cameras were fixed (did not track movement) and recorded Defendant and other employees for approximately 39 days. Tr. 161: 5-18.

On May 10, 2023, Agent Martínez decided to interview Defendant. Tr. 172: 16-18. Agent Martínez and two other agents participated in the interview. Tr. 173: 3-6. The agents wore civilian clothes but identified themselves and showed credentials. Tr. 174: 1-4; 14-17; Tr. 178: 5-10. Defendant willingly walked to the interview room. Tr. 175: 17-19. The interview took place at a large conference room and the door was left open through the duration of the interview. Tr. 176: 8-13; Tr. 177: 8-10. Defendant did not seem afraid, confused, or intimidated. Tr. 178: 23-25; Tr. 179: 1-3. Defendant was presented with a form which contained his <u>Miranda</u> rights in Spanish. Tr. 179: 7-16. Defendant was not under arrest at that time, but he was a suspect in a criminal investigation. Tr. 179: 17-20. Agent Martínez read the form to Defendant and asked him whether he had any questions. Tr. 182: 8-18. Defendant then read the form, wrote his name and that of Agent Martínez in the top part of the form, placed his initials next to each of the numbered rights in the form, and signed and dated the form in the bottom part. Tr. 181: 5-21; Tr. 182: 8-18; Tr. 183: 1-25; Tr. 184: 1-12; Tr. 240: 21-25; Tr. 241: 1-3. Government Exhibits M and M-1. Above Defendant's signature the form reads as follows:

> I have read my rights or have had my rights read to me as state above and I understand my rights. With this knowledge, I am willing to make a statement and answer questions. At the moment, I do not wish to consult with an attorney, and I do not wish to have an attorney present during my interview. I understand and recognize what I am doing. I have not been threatened or made promises, and I have not been coerced in any way. Government Exhibits M and M-1.

Defendant asked whether he needed to have a union representative present at the interview. Tr. 186: 23-25. He was told that he could chose to have one, but he shook his head in the negative when asked whether he wanted to call a union representative. Tr. 187: 1-5. Defendant was responsive and gave incriminating statements. Tr. 188: 4-6; Tr. 191-193. Defendant did not ask for an attorney to be present, nor did he inform Agent Martínez that he would remain silent. Tr. 236: 13-22. Defendant could have chosen to stop the interview and leave at any point of the interview. Tr. 194: 1-6.

### III. Discussion

#### A. Motion to Suppress

#### 1. Did Defendant have an expectation of privacy in his workplace? No.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures". U.S. Const. amend. IV. Accordingly, searches and seizures should be conducted only after acquiring a warrant supported by probable cause. Id. To assert a violation of Fourth Amendment rights, a person needs to have legal standing to do so. This means that only a person whose reasonable or legitimate expectation of privacy has been invaded by a search or seizure can seek redress under the Fourth Amendment. Smith v. Maryland, 442 U.S. 735, 740 (1979) (discussing Katz v. United States, 389 U.S. 576 (1967) (string of cases omitted)). To determine whether a person has standing to seek the suppression of evidence illegally searched and seized, we first inquire what is the activity that is being challenged. Id. at 741. We then look at two criteria. A subjective one, which requires that the complainant have an actual expectation of privacy over the things or activities at issue and to have taken steps or demonstrated an intention of keeping those things or activities private. Id. at 740 (citing Katz, 389 U.S. at 361); Vega-Rodríguez v. Puerto Rico Telephone Co., 110 F.3d 174, 178 (1st Cir. 1997). The objective factor requires that the complainant's expectation of privacy is one that society is prepared to recognize as reasonable. Smith, 442 U.S. at 740 (citing Katz 389 U.S. at 353); Vega-Rodríguez, 110 F.3d at 178. See also United States v. Moore-Bush, 36 F.4th 320, 328 (1st Cir. 2022) (examining the two criteria).

The law contemplates that an individual could have an expectation of privacy in an office or commercial structure. Oliver v. United States, 466 U.S. 170, 179-181 (1984); Vega-Rodríguez, 110 F.3d at 178 (lesser expectation of privacy in a business premise than in a residence) (citations omitted); Mancusi v. DeForte, 392 U.S. 364, 367 (1968) (Fourth Amendment protection extends to commercial premises if a reasonable expectation of privacy can be established). Also, government or public employees could have a reasonable expectation of privacy in their place of work. O'Connor v. Ortega, 480 U.S. 709, 717 (1987). To discern whether an expectation of privacy exists in a commercial setting or workspace, the Court evaluates the facts of the case. Id. at 718 (whether a public employee has an expectation of privacy in the workspace must be assessed on a case-by-case basis); see also United States v. Mancini, 8 F.3d 104, 109 (1st Cir. 1993) (rejecting

expectation of privacy only in a person's own workspace and rejecting an automatic extension of expectation of privacy beyond employee workspace; "truth lies somewhere in between"). Some of the factors to consider in making such a determination include whether the work area is used exclusively by the employee, the extent to which others have access to the area, the nature of the employee's employment, and whether office regulations placed employees on notice that certain areas could be subject to employer intrusions. Vega-Rodríguez, 110 F.3d at 179-80.

Defendant seeks the suppression of surveillance videos made by USPS OIG during the investigation of Defendant for mail theft. The video cameras were placed after the USPS OIG gathered evidence that mail had been ripped open during Defendant's shift in the Canceler machine at La Cerámica. The video cameras were installed above the Canceler machines. The Canceler machines are two large mail sorting machines located in a warehouse. Even though Defendant contends that he was the only person working with the machine at a given time, the evidence established that other USPS employees, such as mail handlers and maintenance workers, also worked with the Canceler machine at the same time as Defendant. The warehouse where the machines are located has no walls or doors and is generally open to other USPS employees who come in and out of the warehouse during work hours. In fact, there is an area in the warehouse for trucks to come in and out (see Government Exhibit A) and Defendant testified that approximately 20 people could be found in the general vicinity of the Cancelers during his work shift. The evidence also established that the punch clock and the coffee station used by all employees are in an area close to the Cancelers. In sum, the video cameras at issue were placed in a warehouse controlled by the USPS that is readily accessible to many USPS employees. The video cameras were placed to capture illegal activity in relation to the operation of USPS machines. O'Connor, 480 U.S. at 719 (discussing the need to examine the nature of the intrusion versus the importance of the governmental interests that justify the intrusion). Given the circumstances under which the video cameras were installed, even if the Court were to deem that Defendant took actions to maintain his activities private, "[i]t is simply implausible to suggest that society would recognize as reasonable an employee's expectation of privacy against being viewed while toiling in the […] open and undifferentiated work area." Vega-Rodríguez, 110 F.3d at 180 (no exclusive workstation, no private offices or cubicles and undivided space, no reasonable expectation of privacy); see e.g., United States v. Burnette, 375 F.3d 10, 17 (1st Cir. 2004) (citation omitted), *overruled on other*

*grounds by* 543 U.S. 1181, 125 S.Ct. 1406, 161 L.Ed.2d 176 (2005) (reasonableness of expectation of privacy depends on the layout of the mailroom and mailboxes, the procedures for mail delivery and storage, and the agreement with clients as to access to mail inside the mailboxes).

The foregoing conclusion is also supported by the USPS' regulations which give notice to employees regarding the use of video cameras to monitor USPS work areas. O'Connor, 480 U.S. at 717 (privacy expectations of public employees may be reduced by virtue of office practices and procedures). As argued by the Government, Section 273.172 of the USPS Administrative Support Manual, Issue 13 (published in July 1999 and updated through January 31, 2021)[1] establishes that the USPS uses closed-circuit television (CCTV) systems, or non-digital video cameras, "for the protection of its employees, mail, and postal assets, and to monitor automated mail flow operations." As described, the "CCTV systems are to function as deterrents, and if a crime occurs in the monitored area, to record evidence if it." Section 271.5 of the USPS Administrative Support Manual also explicitly contemplates the installation of video cameras to examine and inspect USPS property for law enforcement purposes, as it was done in this case by Agent Martínez: "[a]ll Postal Service-owned or -furnished property […] and its contents are at all times subject to examination and inspection by duly authorized postal officials in the discharge of their official duties. The Chief Postal Inspector, Inspector General, officers, and heads of installations or their designated representatives are authorized to examine and inspect, as their duties may require, such Postal Service-owned or -furnished property and its contents. For purposes of this section, law enforcement examination and inspection include searching, monitoring, and video recording." Government Exhibit L. See Vega-Rodríguez, 110 F.3d at 180 (notification of video surveillance to employees reduces employee's expectation of privacy at work; no objectively reasonable expectation of privacy against disclosed, soundless video surveillance while at work). There can be no question that protecting the safety of the mail and the need for preventing and discovering theft of the mail is of great governmental importance. Therefore, the existence of valid regulation putting Defendant on notice of the potential governmental intrusion for law enforcement purposes (as deterrent and to record evidence of a crime) and to protect the property of the USPS defeats

---

[1] The USPS Administrative Support Manual is a source of regulations for the USPS. See 39 C.F.R. § 211.2(a)(2).

**United States v. Alarcón-Rodríguez**
**Criminal No. 23-354 (FAB)**
**Report and Recommendation**

any argument of reasonable expectation of privacy in the workplace by Defendant. See e.g., United States v. Bunkers, 521 F.2d 1217, 1219–20 (9th Cir. 1975) (search of postal worker's locker authorized by regulation). Defendant did not have an expectation of privacy that society would accept as reasonable given that his activities were already visible to the public, his coworkers, and could be monitored pursuant to USPS regulation.

      Defendant seeks refuge under case law that has held that prolonged searches may infringe on a person's expectation of privacy. Defendant cites to United States v. Jones, 565 U.S. 400 (2012), United States v. Maryland, 615 F.3d 544 (D.C. Cir. 2010) and United States v. Moore-Bush, 36 F.4th 320, 328 (1st Cir. 2022). But none of these cases are of help to Defendant. The U.S. Supreme Court in Jones held that tracking a vehicle with a GPS was a search even when the person driving the vehicle was travelling on the public road. Jones, 565 U.S. at 404. The issue before the D.C. Circuit in Maryland was whether using a GPS device to track a person's movements 24 hours a day for 28 days— discovering a person's totality and pattern of movement from place to place— constituted a search. Maryland, 615 F.3d at 558. The court concluded that a person's movements 24 hours a day is not something that is exposed to the public and that, consequently, prolonged GPS monitoring of a person's movements 24 hours a day constitutes search. Id. at 559-565. Notably, the D.C. Circuit in Maryland rejected the Government's argument that its decision would necessarily imply that a prolonged visual surveillance in a public place would also constitute a search subject to the warrant requirement of the Fourth Amendment. Id. at 566. Finally, the analysis performed in the concurring opinion in Moore-Bush, 36 F.4th at 321, was related to a video pole-camera surveillance of the front curtilage of the defendants' residence over a course of eight (8) months. Id. Defendant claims that a prolonged search occurred here because the video cameras installed by USPS OIG recorded Defendant and other employees for approximately 39 days. Tr. 161: 5-18. But the video cameras were installed and fixed in Defendant's open workplace, not his car or in front of his residence. The video cameras did not follow Defendant's every move, but only his operation of the USPS machine during work hours when La Cerámica was readily available to many USPS employees. No prolonged search triggering Fourth Amendment concerns occurred.

**United States v. Alarcón-Rodríguez**
**Criminal No. 23-354 (FAB)**
**Report and Recommendation**

### 2. Were Defendant's rights under the Fifth Amendment infringed? No.

Pursuant to the Fifth Amendment of the United States Constitution, no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Premised on this constitutional right, the U.S. Supreme Court in Miranda v. Arizona, 384 U.S. 436, 444 (1966) held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." United States v. Lugo Guerrero, 2005 WL 8163207, at *6 (D.P.R. Oct. 14, 2005). The procedural safeguards under Miranda require that the suspect be adequately and effectively appraised of his rights, and that the exercise of those rights be honored by law enforcement. Missouri v. Seibert, 542 U.S. 600, 608 (2004). To be sure, Miranda not only requires that the suspect be informed of his rights but that police cease questioning immediately upon the assertion of rights. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). Therefore, the Fifth Amendment privilege against self-incrimination requires that, prior to questioning a suspect, the police appraise the suspect of his right to remain silent and to have counsel present during questioning, that counsel could be appointed free of charge, and of the state's intention to use any of his statements to secure a conviction. Moran v. Burbine, 475 U.S. 412, 420 (1986) (discussing Miranda, 384 U.S. at 468-470, 473-474).

Miranda rights may be waived. The Court is required to presume that a defendant has not waive his Miranda rights. United States v. Downs-Moses, 329 F.3d at 267 (citation omitted); United States v. Carpentino, 948 F.3d 10, 26 (1st Cir. 2020). The burden is on the Government to prove a valid waiver by the preponderance of the evidence. Id.; Colorado v. Connelly, 479 U.S. 157, 168 (1986); Carpentino, 948 F.3d at 26. The inquiry is two-fold: (1) the relinquishment of rights must be a free and deliberate choice, absent intimidation, coercion or deception, and (2) the waiver must be made with full awareness of the nature of the rights being abandoned and of the consequences of such abandonment. Moran, 475 U.S. at 421 (citations omitted); Carpentino, 948 F.3d at 26. The Court is tasked with examining the totality of the circumstances to ascertain whether a waiver of Miranda rights is valid. Moran, 475 U.S. at 421 (citations omitted).

Defendant moved the Court to suppress any incriminating statements made by him during the interview with Agent Martínez on May 10, 2023. He asserts that his rights under the Fifth Amendment were violated because his participation in the interview was not optional and that he

8

was not fully informed of the consequences of self-incrimination. Even though Defendant testified during the hearing, he did not provide any testimony to substantiate his claims under Miranda. On the other hand, the testimony of Agent Martínez established that Defendant was advised of his rights under Miranda, understood those rights, and voluntarily agreed to their waiver.

Agent Martínez read the Miranda form to Defendant, allowed him to also read the form, and confirmed that Defendant understood his rights. Tr. 182: 8-18; Tr. 181: 5-21; Tr. 182: 8-18; Tr. 183: 1-25; Tr. 184: 1-12; Tr. 240: 21-25; Tr. 241: 1-3. Government Exhibits M and M-1. Defendant placed his initials next to each of the Miranda rights in the form. Id. Defendant signed the waiver in the form agreeing to speak to Agent Martínez and did not ask for an attorney to be present. Tr. 236: 13-22. There is no indication whatsoever that the act of placing his initials on the form was involuntary or coerced. Furthermore, the waiver portion of the form contains unequivocal language of the waiver of rights required by Miranda: "I understand my rights." "I am willing to make a statement and answer questions." "I do not wish to consult with an attorney, and I do not wish to have an attorney present during my interview." "I have not been threatened or made promises, and I have not been coerced in any way." Id. The Court cannot but conclude that the Miranda form was read and understood by Defendant, and that he initialed and signed the document voluntarily and knowingly. In and of itself this is strong evidence of waiver. See United States v. Hunter, 2007 WL 9627982 (D.P.R. July 9, 2007) (string citations omitted) (document read in Spanish, defendant appeared to understand explanations and what was being read, and document signed; waiver found); Seibert, 542 U.S. at 608-609 ("giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility") (citation omitted); see e.g., United States v. Van Dusen, 431 F.2d 1278, 1280 (1st Cir. 1970) (defendant appeared to have read and understood written waiver of rights, evidence of voluntariness); United States v. Lugo Guerrero, 524 F.3d 5, 8, 12 (1st Cir. 2008) (defendant read form, initialed each line, said he understood and signed forms; waiver found); United States v. Palmer, 203 F.3d at 60 (agent recited Miranda rights from form, defendant expressed to have understood, defendant read and understood waiver form and initialed and signed waiver; waiver found).

Furthermore, contrary to Defendant's assertions, Agent Martínez testified that Defendant willingly walked to the interview room. Tr. 175: 17-19. That he did not seem afraid, confused, or intimidated. Tr. 178: 23-25; Tr. 179: 1-3. That he was responsive and gave incriminating

statements. Tr. 188: 4-6; Tr. 191-193. And that he could have chosen to stop the interview and leave at any point of the interview. Tr. 194: 1-6. Defendant presented no evidence to sustain his allegation that he felt coerced for fear of being terminated from employment. Contrary to the case of Garrity v. State of New Jersey, 385 U.S. 493 (1967), cited by Defendant in his brief, Defendant has not pointed to any statute that required him to forfeit his job or incriminate himself. Rather, the form presented to Defendant, which he initialed and signed, expressly reassured Defendant: "If I refuse to answer the questions because they may be incriminating, I will not be disciplined for merely remaining silent." Government Exhibits M and M-1. Even if the Court were to credit Defendant's purported fear of an adverse employment action, this would only explain Defendant's decision to walk with the agents and participate in the interview but not his decision to proactively waive his rights to counsel and to remain silent after being alerted of his rights under Miranda. There is simply no evidence of coercion or involuntariness. Colorado v. Connelly, 479 U.S. at 167; United States v. Boskic, 545 F.3d 69, 78 (1st Cir. 2008); United States v. Bezanson-Perkins, 390 F.3d 34, 39 (1st Cir 2004) (only confessions procured by coercive official tactics should be excluded as involuntary).

### B. Motion *in Limine*

The Government's motion *in limine* seeks to preclude Defendant from arguing to the jury that the USPS OIG could not install a video surveillance camera to observe Defendant during work hours. Docket No. 22. The arguments made by the Government are premised on Defendant's lack of expectation of privacy in his workstation during work hours. Defendant's opposition is premised on the same arguments addressed and rejected in this recommendation.

### IV. Conclusion

For the reasons discussed above, Defendant's motion to suppress at Docket No. 25 should be **DENIED** and the Government's motion *in limine* at Docket No. 22 should be **GRANTED.**

**IT IS SO RECOMMENDED.**

This Report and Recommendation is issued pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed within fourteen (14) days of its receipt. Failure to file timely and specific objections to the Report and Recommendation is a waiver of the right to review by the District Judge and of

**United States v. Alarcón-Rodríguez**
**Criminal No. 23-354 (FAB)**
**Report and Recommendation**

appellate review. <u>Thomas v. Arn</u>, 474 U.S. 140, 154-155 (1985); <u>Davet v. Maccorone</u>, 973 F.2d 22, 30-31 (1st Cir. 1992).

    In San Juan, Puerto Rico, this 2nd day of July 2024.

<u>s/Giselle López-Soler</u>
GISELLE LÓPEZ-SOLER
United States Magistrate Judge
